HUTCHESON *v.* HEIRS OF McNUTT.

*Chancery.*

Contract in writing, executed by one party only, stipulating to convey part of certain lands, the other party "being at one-half the expense, in land or otherwise, for procuring a title to the same," payment of the expenses held a condition precedent, and to be paid as they were incurred, or right perfected.

The party omitting to pay the expenses according to agreement, can not, after a lapse of years, be aided in equity against the forfeiture.

A proposition to convey, upon receiving the proportion of the expenses, not complied with by immediate payment, no waiver of the forfeiture.

THIS case was decided by Judges Pease and Burnet, in Madison county, July, 1823. The whole case is set out in the opinion by Judge Burnet. No arguments of counsel were furnished.

The complainant sets out in his bill, that in December, 1799, James McNutt, since deceased, executed an instrument of writing under his hand and seal, in the following words : "Be it remembered, that I, James McNutt, of Madison county, and State of Kentucky, do covenant and agree with John Hutcheson, of the county of Monroe, and State of Virginia, to make over and convey to the said Hutcheson, his heirs, or assigns, the one-half of the land that I shall obtain in virtue of my contract with Charles Arbuckle, heir at law of Matthias Arbuckle, deceased, on a military warrant for four thousand acres, obtained by the said Hutcheson for the representatives of Matthew Arbuckle, deceased, on the said Hutcheson being at one-half the expense, in land or otherwise, for procuring a title for the four thousand acres, to which agreement I bind myself, and heirs, firmly by these presents. Sealed with my seal, and dated this 23d day of December, 1799." The bill also states, that in July, 1800, *the said James McNutt caused the said  [15 warrant to be located on four tracts, of one thousand acres each, on Darby creek. That afterward, to wit, in October, 1801, the said Arbuckle and McNutt made a division of the said tracts of land, in pursuance of their contract, by which the said McNutt received two tracts, containing together fifteen hundred and fifty

acres, as his share. That afterward, in July, 1806, the complainant, by his agent, called on McNutt, requested a conveyance of half the said land, and offered to pay him the one-half of any necessary expenses he had been at. That McNutt hath obtained patents for the said land, in his own name, and hath refused to convey the moiety thereof to the complainant.

The bill also charges, that in July, 1801, the said James McNutt passed his obligation to the complainant, to make him a clear and sufficient deed to two hundred acres of land, in the Northwestern Territory, in that part laid off for the officers and soldiers of the Virginia line—that the land should be of the second quality—that the title should be made as soon as grants could be obtained, but that this contract was on the express condition, that if the warrant of James Thompson for 2,666 66-100 acres, which had been assigned by the complainant to Henry Banks, should be completely put in the possession of, and secured to the said Thompson, the contract was to be binding, otherwise to be void. The bill further states, that the said warrant was obtained from H. Banks, and put into the possession of McNutt, and that grants had been obtained for the land. That the said James McNutt died in 1809, and that the defendants are his heirs at law. The complainant prays for a specific performance, and for general relief.

The defendants, by their answer, admit that their father James McNutt, executed the contracts of December, 1799, and July, 1801; that the lands were located, divided, and partitioned, as is stated in the bill; but they allege that under the contract of 1799, the complainant did not advance the moiety of the expenses, and that under the contract of 1801, he did not procure the warrant of Thompson, and secure the same, as he was bound to do.

It appears from the testimony and exhibits, that in October, 1801, McNutt wrote to the complainant, advising him of what he had done—stating the amount of his expenses in procuring the title to Arbuckle's land, and complaining that the warrant of Thompson had not been obtained. That in September, 1802, he wrote to complainant, stating an estimate of his expenses—that there would **16]** *be five hundred and fifty acres coming to complainant when he paid the half of the expenses, and urging him to send him money, as he was in need. It appears that the complainant took no notice of these communications, but suffered the matter to sleep till 1806, when he sent his son to demand a conveyance, and

tender a moiety of the expenses. That McNutt, at that time refused to receive the money, or make the conveyance. That all the expenses of locating and procuring a title to the land, on Arbuckle's warrant, had been advanced by McNutt. That he had also paid the taxes from 1800 to 1806 : and it does not appear that complainant has at any time paid to McNutt, or to any other person, a single cent on account of this land. It also appears that on the division between Arbuckle and McNutt, in October, 1801, the former gave the latter fifty acres and fifty dollars for the choice of tracts. That the complainant did not sign either of the contracts, or enter into any other obligation binding him to a performance. It also appears, that the warrant mentioned in the contract of 1801, was obtained by the exertions and at the expense of Thompson and McNutt. That the complainant refunded to Thompson the money expended by him. That McNutt in 1802 recognized the claim on this contract, soliciting a remuneration for his trouble and expense. That the warrants mentioned in this contract have been located, and the lands patented.

The claim of the complainant to a specific execution of these several contracts will be considered separately.

The first question presented on the contract of December, 1799, is whether the payment of a moiety of the expenses be not a condition precedent.

McNutt covenanted to convey to Hutcheson the one-half of the lands, "on the said Hutcheson being at one-half of the expense." It is said that the participle, doing, performing, etc., prefixed to a covenant, renders it a mutual covenant, 2 H. Black. 1315 ; but when the covenant goes to the whole consideration, on both sides (as it does in the case before us), it is a condition precedent. 1 Fonb. 382. This contract was not signed by both parties, so as to give mutual remedies. It is the contract of McNutt alone. Should the defendants therefore execute the conveyance before the payment of the money, they are left without recourse ; but not so with the complainant, who, by paying his money in pursuance of the contract, perfects his right to call for a conveyance. Equity will always respect the intention of the parties, rather than the literal meaning of their words. The design in this case must have been, *that the complainant should pay the money, as the meritorious [17 cause of the conveyance; otherwise, as the complainant is under no promise or contract to pay, the defendants might be required to

part from the land without the possibility of receiving the money. 1 Stra. 571. The case of Pordage v. Cole, 1 Saund. 320, is in confirmation of this doctrine; for although the plaintiff, in that case, had judgment, it was on the ground that both parties had sealed the contract, and had mutual remedies against each other; but the court observed that it might have been otherwise, if the specialty had been the words of the defendant only, and not the words of both parties, by way of agreement. A time also had been fixed for payment, which is a circumstance entitled to weight, and is stated, in a note to that authority, as the principal ground of the judgment. A reference to the natural order of the transactions, as to time, which form the substance of this contract, will show that the payment must be a condition precedent. When the contract was made the warrant had not been located; the fee of the land was in government, and consequently it was necessary that an entry and a survey should be made, and a patent obtained. These preparatory steps were to be taken before the complainant could have a right to demand a deed; but these steps could not be taken without incurring the expense which the complainant was to pay. This payment, then, was necessarily to precede the conveyance, and until the complainant saw proper to meet it, he voluntarily, by his own laches, rendered it impossible for McNutt to execute a conveyance, as then McNutt could not pass a title until he obtained a patent, and as the patent could not be obtained without the payment of the expense, that payment was unavoidably to precede the conveyance, and must be a condition precedent.

In the case of Jones v. Barkley, Doug. 691, it is said by Lord Mansfield, that the dependence or independence of covenants was to be collected from the evident sense and meaning of the parties, and that however transposed they might be in the deed, their precedence must depend on the order of time, in which the intent of the transaction requires their performance.

The application of this rule to the case in hand is manifest. The expense of procuring the title must, in the nature of things, arise, before the title is secured; and until this be done, McNutt can be under no obligation to convey.

The cases of Thorp v. Thorp, 12 Mod. 455; Duke of St. Albans v. Shore, H. Black. 270, and Goodison v. Nunn, 4 Term, 761, throw 18] *much light on this question, and will be found to support the principle contended for. In the last case Lord Mansfield says, the

determinations in the old cases, on this subject, outrage common sense, and that he is glad to find they have been overruled; that it would be absurd to say the purchaser might enforce a conveyance without payment, and compel the seller to have recourse to him, who perhaps might be an insolvent person.

Another question arising on this contract is, whether Hutcheson was not bound to advance his part of the expenses as they accrued, and whether, by neglecting to do so, he has not put it out of his power to perform the condition on his part. The nature of the transaction itself appears to be decisive on this point. McNutt, by his contract with Arbuckle, was to have a moiety of the land that should be obtained on a certain warrant; he was to locate the warrant, obtain the patent, and defray the half of the expense. He then entered into the contract we are now considering, by which he agreed to convey half the land he might receive on his former contract to Hutcheson, provided he would be at half the expense of procuring the title. No part of this expense was to go into the pocket of McNutt. It was to be paid out to others, and it forms the whole consideration of the contract. The only benefit which McNutt could receive from this arrangement, was to be relieved from the inconvenience of raising the money that would be required to meet the expense, and for this, and this alone, he agreed to give up half the land.

It appears that the whole expense was less than one hundred dollars, which bore no comparison to the value of the property; consequently McNutt stipulated for no consideration that can be considered as a price for the land. He agreed to give it to the complainant without receiving a cent for his own use. The only possible benefit, therefore, that McNutt could receive from the arrangement, was the aid of Hutcheson, in advancing the money that would be necessary in securing the title. If, therefore, he can be left to provide the whole amount of this expense, he may lose the only advantage that could have induced him to enter into the contract; he may be left to encounter all the difficulty and inconvenience which he seems to have been desirous of getting rid of, and to be relieved from which, formed the only motive that could have induced him to make the contract. The true consideration, then, must have been the convenience of this advance, to secure which it was necessary to furnish the money as the expenses arose; for *by leaving McNutt to make the advance, he must suffer the [19

very evil from which the contract was intended to relieve him ; and having once suffered it, he has lost the only benefit which he intended to secure. Had it been perfectly convenient for McNutt to make the advance, he would be chargeable with gross folly for stipulating as 'he has done, and equally so if he intended nothing more than to have the expenses refunded at some future day, as it might be convenient to Hutcheson.

From this view of the subject we are driven to the conclusion, that the consideration of this engagement was, not that Hutcheson should merely be accountable for these expenses, but that he should meet them as they might arise, so as to save McNutt from the inconvenience of an advance. The time of payment, therefore, is of the essence of the contract, and can not be dispensed with ; for we have seen that the consideration does not consist principally in the amount to be paid, which is admitted to be a mere trifle, in comparison with the value of the property, but in the time of payment.

Inasmuch, therefore, as the complainant did not advance the money, as he was bound to do, in consequence of which McNutt has been compelled to make the advance, and has thereby incurred all the inconvenience from which the contract was designed to relieve him, it has become impossible, in the nature of things, for the complainant to perform the condition or render to the defendants a satisfaction.

It is also a circumstance entitled to much weight, that this contract is not mutual. It is obligatory on McNutt, but not on Hutcheson. He was under no obligation to pay the money, or accept the land, but was at liberty to claim or abandon it at his pleasure· There ought, therefore, to be some period fixed for the determination of his will, otherwise he might keep the defendants in suspense indefinitely, and prevent them from improving or disposing of the property. It would be inconvenient and unequal for one party to be thus bound, while the other was at perfect liberty ; and yet this consequence results unavoidably from any other construction than that which has been given, for if the complainant were not bound to make his election by advancing the money when the expenses accrued, there is no time fixed by the contract for the payment, and he may keep the defendants in suspense during his pleasure. This is the unavoidable consequence of an admission that the condition, on the part of Hutcheson, can be performed

after the expenses have been incurred and paid by McNutt. This view of the subject leads *us to the same conclusion, that [20 the payment is a condition precedent, and must be made at the time contemplated by the parties, and that if it be not so made, the money can not be afterward paid, so as to save the condition.

In the case of Purkhurst *v.* Van Corland, 1 Johns. Ch. 282, Chancellor Kent recognizes the doctrine, that a court of equity will never decree performance where the remedy is not mutual, or one party is only bound by the agreement. This distinguished judge lays down the same principle in the case case of Benedict *v.* Lynch, Ib. 373, and refers to 2 Vern. 415 ; 1 School and Lefroy, 13 ; Bunb. 111 ; 5 Esp. 240 ; 11 Vessey, 592, as settling the point.

Another view may be taken of this contract, calculated to strengthen the conclusion already drawn.

McNutt covenants to convey to Hutcheson, " on the said Hutcheson being at half the expense." How can he be at half the expense, unless he pays the money as the expense accrues ? Paying a particular claim is one thing, and refunding the amount to him who may have paid it, is another. Suppose McNutt had been destitute of money, and the person to whom the expenses were to accrue, refused to give credit, in consequence of which the title could not be perfected, would the complainant, in that case, have a right to exact performance from McNutt, or recover damages for his inability to perform ? The answer must be in the negative, and only one reason can be given in support of it, viz : that Hutcheson having refused to perform the condition, on the performance of which McNutt had covenanted to convey, and having thereby rendered a performance impossible, would have forfeited his right to the contract and released McNutt from the obligation of his covenant. If this consequence would result from the inability of McNutt to meet the expenses, and the consequent loss of the land, it must be difficult to assign a reason why Hutcheson should be saved from the legal consequence of his laches, because McNutt or some other person was compelled to perform the condition in his stead. If the advance of this money was so much of an object to McNutt, as to induce him to make the contract in the first instance, we may presume that the same object might induce him, or that necessity might compel him to give a similar advantage to some other person, for the purpose of securing the land. Suppose this to have been the case, on what principle of justice or equity could Hutcheson, by

offering to refund, exact the remaining moiety of the land.  So far as his rights are involved, it certainly makes no difference whether 21] *the land was lost to all the parties, for want of money to secure the title, or whether necessity required McNutt, on the failure of Hutcheson, to make a similar contract with some other person, or to suffer the inconvenience of raising the money himself.  In either case he must have lost the entire consideration of his contract, and must necessarily be discharged from its obligation.  Admitting, then, as the fact is, that McNutt advanced the whole expense, and thereby secured the title, Hutcheson can claim no merit on that account—his right is as completely lost as it would have been had the whole land been forfeited to Arbuckle by his failure. The merits of another can not be transferred to him; his claim must be supported by his own performance or fall by his laches.

The next question that arises is, whether this be a case that will authorize a court of chancery to relieve the complainant from the forfeiture incurred by his default.

It is said that in all cases of penalty, or forfeiture, equity will relieve, if compensation can be made, and the default be only in time.   The true ground of relief in such cases, is to be found in the intention of the parties.   Where, from the nature of the agreement, the penalty is only intended as a security that the consideration shall be performed, a court of equity may relieve, for notwithstanding they do so, they give the party that which he stipulated to receive, and therefore no injury is done; but where the relief would destroy the substance of the contract, as if the thing stipulated be a collateral act, relief can not be granted, for no precise value can be affixed to such an act.   In the case before us, the condition was the performance of an act to third persons, and the inconvenience resulting from the non-performance can not be determined, and of course there is no criterion for fixing a compensation.   The disappointment might have forced McNutt to a sacrifice equal to the then value of the land.   Many cases are found in the books, in which parties have been relieved from the consequences of not performing their covenants at the precise time stipulated; but they are cases in which performance could be done in conformity with the undertaking, and the parties sustained no injury thereby, and even in these cases the rule on which relief is granted has been very much narrowed.   Newland on Contracts, 242; 4 Bro. 494; 4 Ves. 667, 686; 5 Ves. 720, 818; 13 Ves. 224.

22

The true doctrine appears to be, that a person who demands a specific performance, must show that he has been in no default, unless he can account for it by special circumstances; and if through *his own negligence he can not perform the whole on his side, [22 he can not compel the other side to a performance, because such performance would not be mutual. And for the same reason, when a man has trifled, or shown a backwardness on his part, equity will not decree a specific performance in his favor, especially if circumstances are altered. 1 Fonb. 384. In the case before us there has been a gross default unaccounted for. The complainant has trifled, the condition can not now be performed, and circumstances are materially altered. The truth of this will appear by a simple reference to dates, and to the change that has taken place, in the circumstances and value of the property. The contract was made in 1799—the expenses were incurred in 1800. The complainant took no step, but remained wholly inactive till 1806, although informed of the amount of the expenses as early as 1802; and the land has increased in value, probably tenfold.

But may we not arrive at a satisfactory solution of this question by attending to the nature and extent of the condition on the part of Hutcheson. He was to be at half the expense of procuring the title. The term expense as used in this contract, ought not to be limited to the money disbursed, but should embrace the time, attention and labor, required to accomplish the object, for as these things were necessary, and are of value, they ought to be classed under the head of expenses. The title could not be secured without them, and in point of value they no doubt exceeded the amount of money paid. Hutcheson performed none of these acts, nor did he procure any other person to perform them. It is at this time impossible for him to perform them, and it is equally impossible to * assess their value. How, then, can he be entitled to relief.

Having disposed of the questions that arise on the contract, we come to those that are presented by the testimony. And first, do the letters of McNutt waive the laches of the complainant, and entitle him to the prayer of his bill.

In the letter of October, 1801, he states the division of the land between Arbuckle and himself, describes the quality of it, and informs complainant that he has paid the fees and taxes, amounting to nearly forty dollars. In the letter of September, 1802, he informs the complainant that he had sent the receipts for the survey-

ing and office fees, and for one year's tax. That there would be five hundred and fifty acres coming to the complainant, when he should pay his part of the expense; he makes an estimate of the expense, and in the close he expresses a hope that the complainant will send him some money, as he is in want.

23] *From these letters it appears that in October, 1801, complainant was informed of the expense—that in September, 1802, the same information was repeated, coupled with a request to send the money, and an admission that on doing so there would be five hundred and fifty acres coming to him.

As these letters were written after the warrant had been located, and the laches of the complainant had taken place, it becomes necessary to inquire, what impression they ought to make on the case. In the first place, it is more than probable that McNutt was ignorant of the true and legal construction of his contract, and that the admission was made under a mistake, arising from an ignorance of his right. We should be warranted in drawing this conclusion, from the tenor of the letters, and from the after conversation with the witness, J. Hutcheson. But if it were to be admitted, that the letters were written with a full knowledge of the true construction of the contract, and that it was the express intention of the writer to waive the laches, and to convey the land on receipt of the money, it would not vary the case, because the letter called for an immediate payment, and held out no offer of further credit. It was, therefore, the duty of Hutcheson to pay the money without further delay, and particularly so, as at the date of these letters it had been advanced more than two years. In 5 Ves. 720, Lord Kenyon is represented as saying, that "a party can not call on a court of equity for a specific performance, unless he has shown himself ready, desirous, prompt, and eager;" but it appears that Hutcheson took no notice of these letters till July, 1806, when he sent his son to demand the deed. This vexatious and unreasonable delay is wholly unaccounted for, and manifests a disposition to trifle with the subject, to a degree that can not be countenanced. The complainant seems to have consulted nothing but his own convenience; he has shown a backwardness that can not be overlooked. When these circumstances are connected with the fact, that the complainant was never bound, either by the contract or the letter, but was at liberty to claim or disclaim, at his pleasure, it seems impossible to resist the conclusion, that he

24

has forfeited any right that might have been set up under the letter. If he could lie still from that time till the year 1806, what limit are we to fix to his negligence? Holding in his hand the right to accept or reject the contract at his pleasure, and knowing that McNutt was in great need of the money, he withholds his election, keeping the other party in suspense, till he finds the land had risen in value fifteen hundred *dollars, or more, then he [24 comes forward and demands a conveyance for the trifling consideration of thirty or forty dollars. At this time the property, in the hands of the present holder, is estimated at many thousand dollars. The claim is certainly unreasonable, and one that no court of equity can, or ought to sustain.

The claim of the complainant to a specific performance on the contract, without the letters, or on the letter considered as a waiver of laches, and a revival of the contract, will be fully met and rebutted by the doctrine in Benedict *v.* Lynch, 1 Johns. Ch. 372. In that case the learned chancellor lays it down as an acknowledged rule in courts of chancery, that when the party who applies for a specific performance, has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification for his delay, and when there is nothing in the acts or conduct of the other party that amounts to an acquiescence in that delay, the court will not compel a specific performance. He adds, that in the case before him the purchaser had paid nothing, but suffered defaults to accumulate from year to year, as if he had forgotten that he was under any obligation to pay, and that if the land had not risen in value, there was no reason to believe that the plaintiff would ever have attempted to raise the money. In that case the last installment was not due when the plaintiff tendered the whole purchase money, and filed his bill, yet the chancellor declared there was a gross negligence on the part of the plaintiff, that took away his claim to assistance.

In the case before this court, the default is much more striking—is wholly unaccounted for, and has not been acquiesced in; for should the letter of 1812 be considered as a waiver of the former laches, it was on the condition of immediate payment, and no inference can be drawn from it in favor of a delay, yet the plaintiff rested till 1806, and thereby incurred a greater default

than had taken place before the letter was written, or than existed in the case just referred to.

Another question arising from the testimony is, whether the act of the complainant, in taking the warrant out of the office and inclosing it to McNutt, can vary the case. It certainly can not, because in the first place it was done before the contract was made, and formed no part of the consideration ; and secondly, because it was attended with no expense, and the labor was so inconsiderable that no pecuniary value can be affixed to it.

The next and last question which the evidence presents on this 25] *branch of the case, is, whether the complainant can claim anything in consequence of the payment of the, fifty dollars by Arbuckle for the privilege of his choice of tracts.

It will be recollected that this transaction took place in October, 1801, more than a year after the forfeiture of the contract, and almost a year before the letter of September, 1802, was written. A moment's reflection, therefore, will show that it can not affect the case.

It is not necessary to notice the conversation, in January, 1806, between the witness, Isaac Hutcheson, and McNutt, as it amounts to nothing more than a proposition for a compromise, without acknowledging any right in the complainant or any obligation on McNutt. On the contrary, it denies the existence of such a right. A man may offer to buy peace on any terms, and shall not afterward be held to his proposition if it be rejected at the time.

On the whole, it appears manifestly that the complainant is not entitled to a specific performance of the contract of December, 1799, and that that contract ought to be delivered up and canceled.

Our attention will now be directed to the contract made in July, 1801. We have seen that this contract was for the conveyance of two hundred acres of land, on this express condition, that a certain warrant therein described should be put in the possession of, and secured to James Thompson or his heirs ; but if this should not be done, that the contract should be void and of no effect. The complaint alleges in this bill, that the warrant was procured by him, and put into the possession of Thompson ; but from his own testimony it appears that the allegation is not literally true. As evidence on this point, he has relied on the letters of McNutt and Stewart, which state very clearly that the warrant was obtained by

the labor, and at the expense of McNutt and Thompson, and that the complainant paid the bill of Thompson's expenses after the warrant had been obtained.   The same fact is clearly deduced from the deposition of Stewart, also relied on by the complainant.   If his right, therefore, to a performance of this contract, were to depend entirely on his own performance of the condition, he would unquestionably fail; but as McNutt and Thompson have both acquiesced in the failure, and have called on the plaintiff for the money expended by Thompson, and as in consequence of this acquiescence and demand he paid the money in 1802, and by so doing actually performed what the parties consented to receive as a substitute for a literal performance, it would seem from the doctrine in the cases above referred to, that neither McNutt nor his heirs can *now avail themselves of a technical breach.   It is a circum- [26 stance of weight, that there was neither backwardness nor delay on the part of Hutcheson after the proposition of 1802, but that he promptly paid the money which the parties had agreed to accept as a commutation for a literal performance.

The defendants have offered the deposition of Henry Banks, to whom the warrant had been assigned, by Hutcheson, and in whose hands it was when this contract was entered into.   The object of this testimony was to show, that although Thompson has been put in possession of the warrant, it has not been secured to him or his heirs, agreeably to the letter of the contract.   The witness states that the warrant in question was sent by him to Cuthbert Banks of Lexington, by whom it was handed over to Thompson, on an agreement that he should have it located, without prejudice to the claims of the witness, and that whatever right, if any, the witness might have acquired, by the assignment of Hutcheson, should be secured to him. It does not appear that Hutcheson had an interest in the warrant, or an authority to sell it, and it would seem from the deposition, that Mr. Banks did not place much confidence in the goodness of his title, for one of the reasons which induced him to send the warrant to C. Banks, was to procure an assignment from Thompson, who, it appears, refused to make an assignment, and denied the power of Hutcheson to sell.   But it is not necessary here to investigate, or settle the right of Henry Banks, nor would it be proper to do so.   It is enough to know, that Thompson was put in possession of the warrant—that he, or his assignees, are in the peaceable enjoyment of the land, and that no claim has been set up against it, or against him

27

or his heirs, on account of it for more than twenty years. Nothing, therefore, can be gathered from the testimony that can destroy the right of the complainant, under the contract of 1801. But as it is a rule recognized in all courts of equity, that he who asks for equity shall do equity, and as in consequence of the negligence of the complainant, McNutt has been put to trouble and cost, for which he has received no remuneration, it is both just and reasonable that the amount of this claim should be ascertained and paid before the defendants are required to execute a conveyance. As the contract calls for no particular tract of land, but for two hundred acres of second-rate land, within the tract set apart for the officers and soldiers of the Virginia line, or continental establishment, the defendants are at liberty to designate any tract, of the quality described, within that district, of which their father, James McNutt, died *seized, and to which it is in their power to make such a conveyance as is required by the contract; but if there be no such land within their power, and assets have come to their hands sufficient for the purpose, let them procure the land, or pay to the complainant the value.

A reference ought to be made to the master commissioner, to ascertain and report the value of the trouble and cost of McNutt, to be paid by the complainant, and whether the defendants can make a good title to two hundred acres of land, such as is described in the contract; and if not, and assets have come to their hands, sufficient for the purpose, what sum they ought to pay as the value thereof, and all further directions stayed till the coming in of the report.